NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0132n.06
Filed: March 5, 2008

Nos. 07-1329, 07-1442

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHARLES RAYMOND LAWLER, | ) | |
| | ) | |
| Plaintiff-Appellee (07-1329) | ) | |
| Plaintiff-Appellant (07-1442), | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THE CITY OF TAYLOR et al., | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees (07-1442), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TROY TORO, | ) | |
| | ) | |
| Defendant-Appellant (07-1329). | ) | |

Before: MOORE, GILMAN, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. In this excessive-force action, Officer Troy Toro claims that the district court erred in denying him qualified immunity, and Charles Lawler claims that the district court erred in dismissing his claims against the City of Taylor. We affirm.

I.

On the evening of February 27, 2004, Lawler dropped his girlfriend off at a bowling alley, then went to a bar where he drank eight to ten beers. Deterred by neither his drunken state nor his

two previous Operating While Intoxicated (OWI) convictions, Lawler drove to his apartment and eventually drove to visit another girlfriend. Shortly after midnight, Sergeant Jeff Witherspoon observed Lawler's '86 Ford speeding and swerving erratically. Witherspoon pulled Lawler over, and Lawler admitted he had been drinking. Officer Toro soon arrived, and the two officers performed field sobriety tests (which Lawler failed) and gave Lawler a breathalyser test (which showed a .20 blood-alcohol content).

In talking to the officers, Lawler alternated between accepting the inevitable and trying to evade it. At times, he resigned himself to the consequences of a third OWI, saying, "You might as well just take me to jail." At other times, he was less submissive. He tried to play upon the sympathies of the officers by telling them he was heading north "[t]o get married"—admittedly lying so that "they might feel sorry for [him] and let [him] go home." He then repeatedly asked Toro (who drove Lawler to the police station) to "drop [him] off at [his] house." Lawler's pleas had no effect on the officers, and when he arrived at the station he apparently was not happy to be there.

Toro escorted Lawler into the booking room, helped him remove his coat and told him to place his hands on a table. As he and Toro conversed, Lawler gestured with his hands, but Toro "kept telling [him] to turn around" and to "put [his] hands on the counter." Lawler did not like being told to turn around, and when he objected Toro "started getting belligerent." Lawler "got tired of [Toro's] yelling," and in response he called Toro a "pussy." A videotape captures what happened next: Lawler raised his left arm slightly and Toro tackled him to the floor face-down, struggled with him for a few moments and struck him forcefully three times—twice slamming his knee into

Lawler's back (once with Lawler's arm pulled back at an awkward angle) and once hitting him with his elbow. Though Lawler resisted being handcuffed, Toro remained on top of him at all times, and Lawler never freed himself from Toro's control. Several other officers eventually entered the booking room and helped handcuff Lawler, who complained about pain in his arm. Two officers escorted him to the hospital for treatment of what turned out to be a broken arm.

Both Lawler and Toro were punished for their actions that day. The City of Taylor charged Lawler with one OWI count (to which he pleaded guilty) and one count of assaulting, resisting or obstructing a police officer (which the city later dismissed). After an internal investigation, the Taylor Police Department discharged Toro.

Lawler filed a lawsuit in Michigan state court against the city, the Taylor Police Department, Chief Thomas Bonner and Officers Toro, Howell, Caldwell, Little and Deguili, alleging a host of violations of federal and state law. The defendants removed the case to federal court, then filed a motion for summary judgment, invoking qualified immunity and state governmental immunity. The district court granted summary judgment to the municipality (because Lawler presented no evidence of an unconstitutional policy) and to all of the officers save Toro (because none was involved in the principal altercation), but it denied immunity and summary judgment to Toro on the federal excessive-force and state assault claims.

II.

A.

Toro argues that the district court should have granted his summary-judgment motion based on qualified immunity. In considering this question, we must read the facts—and watch the videotape—in the light most favorable to Lawler, then address two questions: Does the evidence create a triable issue of fact over whether Toro violated Lawler's Fourth Amendment rights when he seized him? And, if so, were those rights clearly established? *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).

The Fourth Amendment says that a governmental "seizure" of an individual must be "reasonable," a rule that applies to an officer's use of force during a booking procedure. *See Phelps v. Coy*, 286 F.3d 295, 300–01 (6th Cir. 2002). Force in this setting becomes constitutionally excessive if it is "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted).

The district court correctly applied this standard in determining that a triable issue of fact exists over whether Toro's use of force was "objectively reasonable." A review of the videotape shows why. When the altercation occurred, Toro and Lawler were in the booking room of a police station, where Lawler refused to comply with Toro's orders and called Toro an offensive name. No doubt, Lawler's words and actions permitted Toro to use *some* force to compel Lawler's cooperation.

But the Fourth Amendment governs more than just "*when*" force may be applied; it also governs "*how* [that force] is carried out." *Id.* at 395. The videotape of the incident, together with Lawler's account of the verbal sparring that preceded it, would permit a jury to conclude that Toro's use of force in throwing Lawler to the floor was disproportionate to any threat he faced from Lawler. While the videotape shows that Lawler continually raised his hand, he never raised it in a menacing way. And while Lawler admits he insulted Toro, he denies ever threatening him. A triable issue of fact thus exists over the reasonableness of Toro's initial decision to throw Lawler to the floor.

The videotape also undermines Toro's claim that his use of force, after he threw Lawler to the floor, was reasonable. A jury could fairly conclude that, once Toro was kneeling on Lawler's back, it was gratuitous to knee him in the back twice and to hit him once with his elbow. Though Toro disputes some of Lawler's account, the video of the altercation would permit a jury to conclude that Lawler never posed a threat to Toro and that Toro used objectively unreasonable force in reaction to Lawler's continued pleas for leniency, verbal insults and drunken resistance. *See generally Scott v. Harris*, 127 S. Ct. 1769, 1775–76 (2007) (relying on a videotape in assessing summary-judgment evidence).

Toro claims that we must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Graham*, 490 U.S. at 397. True enough. But even if a situation

is "tense, uncertain, and rapidly evolving," that does not innoculate an officer from a charge that he crossed the line from subduing an individual to assaulting him.

The salient point is this: the videotape, together with Lawler's testimony (if believed), would permit a jury to conclude that Toro's serial strikes, which resulted in a broken arm, all occurred after Lawler had been subdued and when the situation was no longer "tense, uncertain, and rapidly evolving." Even if Taylor's current police chief, Dale Tamsen, is correct that "[w]hen someone is starting to confront an officer it's best to . . . take the subject down to the ground," that is not all Toro did: He added two knee strikes and an elbow jab for good measure. Fourth Amendment excessive-force inquiries require a "careful balancing" of the force used "against the countervailing governmental interests at stake," *id.* at 396, and we have held that there is "simply no governmental interest in continuing to beat [an arrestee] after he ha[s] been neutralized, nor could a reasonable officer [think] there [is]," *Phelps*, 286 F.3d at 301. Accepting Lawler's testimony as true and giving his evidence the benefit of all reasonable inferences, we conclude that he has raised a cognizable excessive-force claim because a jury fairly could find that Lawler never posed a threat to Toro's safety (making Toro's take-down excessive) and could find that he was not a threat once he hit the floor (making Toro's knee strikes and elbow jab gratuitous).

The district court also correctly held that Lawler's right to be free from such force was clearly established. In *Phelps*, decided two years before this incident, we held that an officer's use of gratuitous force in a booking room—beyond the point at which any threat could have been

reasonably perceived—violated the individual's clearly established rights. *Id.* at 302. Precedent thus would have made it "clear to a reasonable officer [in Toro's position] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Trying to sidestep this precedent, Toro notes that Chief Tamsen did not think that Toro used excessive force, that Tamsen is a "highly qualified and reasonable officer" and that "officers of reasonable competence could disagree on this issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). But Tamsen's opinion is hardly dispositive of, and indeed may not even be relevant to, the inquiry. As to Toro's decision to throw Lawler to the floor, Chief Tamsen accepted Toro's version of events in concluding that Lawler was "confront[ing]" Toro. That is a luxury we do not have at this stage of the case. As to Toro's decision to strike Lawler three times after he forced him to the floor, Chief Tamsen offers no explanation why such additional force was needed. Rather than polling various officers to ascertain whether a right is clearly established, moreover, we generally look to "pre-existing law," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), as established by decisions of the Supreme Court, this court and other courts, *see Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006). The "hypothetical reasonable officer" we postulate to determine whether Toro should have known "that his actions . . . were objectively unreasonable," *Scott v. Clay County, Tenn.*, 205 F.3d 867, 877 (6th Cir. 2000), is therefore an officer who is aware of the relevant case law. Because our cases clearly established Lawler's right to be free from gratuitous force during booking, *see Phelps*, 286 F.3d at 302, the district court properly denied Toro qualified immunity.

B.

Toro also contests the district court's denial of summary judgment and governmental immunity on Lawler's state law assault claims. Under Michigan law, an individual may bring an assault and battery claim against officers who "use[] more force than reasonably necessary in effecting an arrest," *White v. City of Vassar*, 403 N.W.2d 124, 130 (Mich. Ct. App. 1987) (per curiam), and "actions which would normally constitute intentional torts are protected by governmental immunity" only if "those actions are justified," *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). Because a triable issue of fact exists over whether Toro used objectively unreasonable force, the district court correctly denied Toro's summary-judgment motion on these claims as well.

III.

Lawler's appeal fares no better. He has waived any claims against the other officers by raising only municipal-liability arguments in his brief. And his claims against the municipality lack merit. In conclusory terms, Lawler contends that the city violated his constitutional rights by charging him with obstruction, by failing to terminate Toro based upon prior misconduct and by failing adequately to train Toro. For the reasons aptly recognized by the district court, these claims fail as a matter of law: A neutral magistrate found probable cause for the obstruction charge; the city in reality did discipline Toro for his prior misbehavior; and the city trains its officers on its comprehensive policy barring the use of excessive force. Lawler in the end offers no evidence of

"an existing, unconstitutional municipal policy" to which municipal liability could attach. *City of*

*Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985). His claim therefore must fail.

IV.

For these reasons, we affirm.