RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TIMMY LEE MOSIER,

         *Plaintiff-Appellant*,

    *v.*

JOSEPH EVANS; CROCKETT COUNTY, TENNESSEE,

         *Defendants-Appellees*.

No. 23-5189

───────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:20-cv-02197—J. Daniel Breen, District Judge.

Decided and Filed:  January 9, 2024

Before:  SUTTON, Chief Judge; CLAY and LARSEN, Circuit Judges.

───────────────

### COUNSEL

**ON BRIEF:**  Jeffrey S. Rosenblum, Matthew T. May, ROSENBLUM & REISMAN, PC, Memphis, Tennessee, for Appellant.  Nathan D. Tilly, Dylan E. Sutherland, PENTECOST, GLENN & TILLY, PLLC, Jackson, Tennessee, for Appellees.

LARSEN, J., delivered the opinion of the court in which SUTTON, C.J., joined in full. CLAY, J. (pp. 19–29), delivered a separate opinion concurring in part and dissenting in part.

───────────────

### OPINION

───────────────

LARSEN, Circuit Judge.  After being arrested for public intoxication, Timmy Mosier resisted being escorted to the booking area of the Crockett County Jail.  In response, Crockett County Deputy Joseph Evans pulled Mosier to the ground, which he hit head-first.  Mosier brought federal civil-rights and state-law tort claims against Evans and Crockett County.

The district court granted the defendants' motion for summary judgment on the civil-rights claims and their partial motion to dismiss the negligence claims. Mosier argues that the district court erred in granting each of those motions. For the reasons below, we AFFIRM in part, REVERSE in part, and REMAND.

I.

Timmy Mosier spent the evening of March 2, 2019, drinking heavily and smoking marijuana. Deputy Joseph Evans arrested him on suspicion of public intoxication and took him to the Crockett County Jail.

Mosier was handcuffed, with his hands behind his back, and dressed in overalls and socks when he arrived at the jail. Evans held the strap of Mosier's overalls and walked him toward the booking area. Mosier cursed at Evans and resisted his escort. Mosier turned to face Evans, rather than walking in the direction of the booking area. He walked forward a few steps but then forcefully pivoted away from Evans. Mosier stepped backwards, away from Evans and the booking area and swung his elbow upward toward Evans' arm in an apparent effort to break his grip. Evans, still holding Mosier's overall strap, grabbed it with both hands. Mosier braced himself as Evans pulled him forward by the strap. Evans then pulled the strap down and toward him, causing Mosier to twist down to the concrete floor, which he hit head-first.

Evans asked whether Mosier was okay and called for medics. Evans removed Mosier's handcuffs and wiped the blood from Mosier's face. When the medics did not immediately arrive, Evans went to ask for them again. They attended to Mosier within eight minutes of his hitting his head. The medics concluded that Mosier had a concussion and should see a doctor the next day. Evans asked his supervisor, Captain Roy Mosier,[1] whether Timmy Mosier could be taken to the emergency room that night. That request was granted, and Mosier was taken to the hospital where he received treatment for his cuts and fractures to the bones of his face and spine.

Sheriff Troy Klyce asked Captain Mosier to investigate the incident. Crockett County has a use of force policy that prohibits the use of unnecessary force. Captain Mosier concluded

---

[1]Captain Mosier is Timmy Mosier's first cousin.

that Evans did not use unnecessary force. Crockett County also requires its officers to complete use-of-force training certified by the Tennessee Peace Officers Standards and Training Commission (POST). Evans had received that training and was POST-certified.

Mosier sued Evans and Crockett County in Tennessee state court, bringing federal civil-rights and state-law tort claims against each. The defendants removed the suit to federal court. The district court granted the defendants' motion for summary judgment on the civil-rights claims and their partial motion to dismiss the negligence claims.

Mosier appeals.

## II.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review de novo a district court's order granting a motion for summary judgment, taking the facts in the light most favorable to the nonmoving party. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

## A.

The district court granted Evans' motion for summary judgment on Mosier's 42 U.S.C. § 1983 excessive-force and inadequate-medical-care claims based, in part, on qualified immunity. The defense of qualified immunity protects officials when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When it is asserted, the plaintiff has the burden of showing that the defendant is not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Applying qualified immunity requires asking: (1) whether an official violated a statutory or constitutional right and (2) whether that right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). When the answer to either of those questions is "no," the other need not be addressed. *Price v. Montgomery County*, 72 F.4th 711, 723 (6th Cir. 2023) (citing *Pearson*, 555 U.S. at 236).

1.

The district court concluded that Evans' use of force did not violate Mosier's clearly established rights. We agree. At the time of the events in question, Evans had "been arrested but ha[d] not yet received a judicial determination of probable cause, either through an arrest warrant or a post-arrest probable cause hearing." *Colson v. City of Alcoa*, 37 F.4th 1182, 1187 (6th Cir. 2022) (citing *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010)). So the Fourth Amendment governs his claims. *Id.* The operative question is whether the force used was "'objectively reasonable' in light of the facts and circumstances confronting" the officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (quoting *Scott v. United States*, 436 U.S. 128, 137–39 (1978)).

To show that Evans' actions violated his clearly established rights, it is not enough for Mosier to argue that there is a clearly established Fourth Amendment right to be free from excessive force. That defines the right at too high a level of generality. *See Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[T]he salient question" in evaluating whether a constitutional right is clearly established is whether an official had "fair warning" that his or her conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). That means that, at the time of the events in question, the contours of the right must have been sufficiently well-defined that "every reasonable official" would have understood that his or her actions crossed the constitutional line. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (citation omitted). That usually requires a case with "a fact pattern similar enough" to put the defendant on notice. *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). Although the case need not be "directly on point[,] . . . existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (second alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[S]pecificity is especially important" in Fourth Amendment excessive-force cases, where the constitutional boundaries are intensely fact-dependent. *Rivas-Villegas*, 595 U.S. at 6 (alteration in original) (citation omitted).

Mosier has not met his burden of identifying a case that should have put Evans "on notice that his specific conduct was unlawful." *Id.*; *see Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). He relies heavily on *Lawler v. City of Taylor*, 268 F. App'x 384 (6th Cir. 2008). But

"a plaintiff cannot point to unpublished decisions to meet" the burden of showing a clearly established right. *See Bell*, 37 F.4th at 367. And, in any event, the facts of *Lawler* do not put Evans' conduct "beyond debate;" and neither do the facts of *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002), the published case on which *Lawler* relied.

Lawler was arrested for driving while intoxicated. *Lawler*, 268 F. App'x at 385. In the booking room, Lawler offered only mild resistance: he refused to follow instructions, cursed at an officer, and "raised his left arm slightly." *Id.* at 386. An officer responded by tackling Lawler to the floor face-down and, once he was on top of Lawler, with Lawler under his control, the officer slammed his knee into Lawler's back twice and hit Lawler with his elbow. *Id.* *Phelps* was similar. Phelps, who had been arrested for violating a municipal ordinance, lifted his feet to comply with an officer's instruction. *Phelps*, 286 F.3d at 297. Another officer tackled Phelps, thinking that Phelps was trying to kick his colleague. *Id.* Once that officer was on top of Phelps, who was handcuffed, the officer hit Phelps in the face twice, grabbed his shirt, and banged his head against the floor three times. *Id.* We said that the officers in both cases had violated the plaintiffs' clearly established right to be free from "gratuitous force" in the booking room, "beyond the point at which any threat could have been reasonably perceived." *Lawler*, 268 F. App'x at 388.

Those cases did not provide Evans fair warning that his conduct was unconstitutional. *See Hope*, 536 U.S. at 741. As the district court found, the video evidence makes clear that Mosier was more aggressive and threatening than either Lawler or Phelps. And Evans' response was less severe. Evans walked Mosier, who was handcuffed, toward the booking area, holding on to the strap of Mosier's overalls. Mosier cursed at Evans and resisted being escorted. Mosier forcefully pivoted away from Evans and the booking area. He then swung his elbow upward toward Evans' arm in an apparent effort to break Evans' grip. On Mosier's telling, Evans responded by "slinging" Mosier to the ground by his overall strap. Appellant Br. at 3. Mosier's landing on his head was arguably a foreseeable consequence of that maneuver. But Mosier was actively resisting and was not, at the time of the "slinging," a "helpless and incapacitated suspect." *Phelps*, 286 F.3d at 301–02 (citation omitted). Neither *Phelps* nor *Lawler* clearly establish that Evans' particular use of force was excessive.

Mosier also relies on *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988). Mosier argues that those cases demonstrate a clearly established right to be free from the use of deadly force unless an officer has probable cause to believe that one poses a threat of serious bodily harm. But those cases are too far afield to clearly establish rights helpful to Mosier. In *Garner*, an officer shot a fleeing suspect in the back of the head. 471 U.S. at 4. And in *Robinette*, a police dog killed a suspect. 854 F.2d at 912. Neither case clearly establishes that Evans responded to Mosier with excessive force. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (faulting the Court of Appeals for finding fair warning in *Garner* because its test is framed at too high a level of generality).

The dissent introduces two more cases, not presented by Mosier, which it argues clearly establish that Evans acted unconstitutionally. First, it relies on *Harris v. City of Circleville*, 583 F.3d 356 (6th Cir. 2009), in which Harris, who was handcuffed like Mosier, "stepped back" and was taken down without warning. *Id.* at 366. Second, it relies on *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013), in which Burgess was "compliant" and merely made an inappropriate comment, which was met with force. *Id.* at 474. Those cases do not control because unlike Harris and Burgess, Mosier did not merely step back, and he was not compliant. Rather, Mosier admits that he was "attempting to pull away" from Evans, Appellant Br. at 11, and the district court found that he did so "forcibly," R. 99, Order Granting Defendants' Motion for Summary Judgment, PageID 2172. That is consistent with the video evidence, which clearly shows that Mosier forcefully pivoted away from Evans, stepped backward while Evans directed him forward, and swung his elbow upward toward Evans' arm.

As the dissent notes, the parties dispute the extent to which Mosier posed a threat. But the district court concluded, based on the video evidence, that Mosier was resisting and that there was no genuine dispute of material fact as to whether Mosier posed "at least some threat." *Id.* at 2172–73. Therefore, Evans was permitted to respond with at least "some force." *See Lawler*, 268 F. App'x at 387–88. And the cases the dissent relies on do not clearly establish that Evans responded with too much. *See Guertin*, 912 F.3d at 932.

The district court properly granted Evans summary judgment on this claim because Mosier has not met his burden of establishing that Evans violated his clearly established rights. *See Burgess*, 735 F.3d at 472.

2.

The district court also granted summary judgment to Evans on Mosier's inadequate-medical-care claim. Mosier's briefing on this point is cursory and makes no attempt to meet his burden of showing that Evans violated his clearly established rights. That alone defeats his challenge. *See Price*, 72 F.4th at 723.

B.

The district court granted Crockett County's motion for summary judgment on Mosier's § 1983 municipal-liability claim because no Crockett County policy or custom caused the alleged violation of Mosier's rights. A municipality is not vicariously liable under § 1983 for the harm caused by its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To succeed on a § 1983 claim against a municipality, a plaintiff must show that a municipal "policy or custom" "actually serves to deprive" the plaintiff of his or her rights. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). Mosier starts down a few of those roads, but each is a dead-end.

1.

Mosier argues that Crockett County has two policies that caused the alleged violation of his rights: first, a policy of not requiring more than one deputy to escort an intoxicated arrestee; second, a policy of not conducting meaningful background investigations. Though Mosier describes these as policies, he effectively challenges the County's inaction. Mosier relies on

deposition testimony in which Sheriff Klyce agreed that a single deputy escorting an intoxicated arrestee is consistent with County policy. In other words, Crockett County does not have a policy *prohibiting* a single deputy from escorting an intoxicated arrestee. Mosier argues that the County failed in not enacting a more restrictive policy. That is an allegation of inaction. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (applying inaction framework to alleged "custom of not providing medical attention to pre-trial detainees prior to arraignment").

Inaction can support municipal liability when: (1) there is a clear and persistent pattern of illegal activity; (2) the municipality has notice or constructive notice of it; (3) the municipality tacitly approves of the illegal activity, such that its deliberate indifference can be said to establish an official policy of inaction; and (4) that policy caused the constitutional deprivation. *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). Mosier presents no argument that there is a pattern of constitutional violations, that the County had notice of that pattern, or that the County was deliberately indifferent to that pattern. *See id.* His inaction theory therefore fails.

2.

Mosier argues next that Sheriff Klyce ratified Evans' conduct by performing only a cursory investigation of the alleged constitutional violations, and that his ratification is evidence of a policy or custom. It is possible to demonstrate a policy or custom by showing that an official with final decision-making authority ratified the conduct. *See Thomas*, 398 F.3d at 429. Ratification may take the form of a failure to investigate, provided there have been "multiple earlier inadequate investigations [that] concern comparable claims." *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020) (quoting *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019)). Mosier makes no argument that Sheriff Klyce failed to investigate comparable claims or even that there were such claims. *See Stewart*, 788 F. App'x at 344; *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017). His ratification theory therefore fails.

3.

Finally, Mosier seeks to prove a policy or custom by arguing that Crockett County failed to adequately train Evans. To succeed on a failure to train claim, a plaintiff must show

that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). A showing of deliberate indifference requires that the municipality "completely disregarded" its duty to train. *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023). Typically, that means total inaction in the face of repeated, known, rights violations. *See Shadrick v. Hopkins County*, 805 F.3d 724, 738–39 (6th Cir. 2015). In a "narrow range of circumstances," when a rights violation is a "highly predictable consequence" of inadequate training, repeated rights violations need not be shown. *Id.* at 739 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). But in those cases, the risk of rights violations must be "so obvious," and the inadequate training "so likely" to result in such violations, that the municipality can fairly be described as deliberately indifferent. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Crockett County did not fail to train Evans. Evans received use-of-force training approved by POST. Mosier's expert, Patrick Looper, concluded that the training was inadequate. But the district court found that Looper's report failed to point to evidence supporting that conclusion and therefore failed to create a genuine dispute of material fact as to the adequacy of Evans' training. Regardless, there is no dispute as to deliberate indifference. Mosier presents no evidence of prior instances of rights violations, so he can rely only on the narrow highly-predictable-consequence theory. Assuming that there was an obvious risk that excessive force might be used against intoxicated detainees, the County made sure that Evans received use-of-force training. Where a municipality provides training that addresses a purported risk, that "does not present the same 'highly predictable' constitutional danger." *Harris*, 62 F.4th at 1039 (quoting *Connick v. Thompson*, 563 U.S. 51, 63 (2011)). In situations like this, where relevant training was given, showing that "additional training would have been helpful" does not establish municipal liability. *Id.* (citation omitted). Mosier's failure to train claim fails because it alleges no more than that.

For these reasons, the district court properly granted Crockett County summary judgment on Mosier's *Monell* claim.

III.

The district court dismissed Mosier's state-law negligence claims under Federal Rule of Civil Procedure 12(b)(6). We review de novo a district court's order granting a motion to dismiss. *Health One Med. Ctr., Eastpointe P.L.L.C. v. Mohawk, Inc.*, 889 F.3d 800, 801 (6th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A.

The district court relied on the "civil-rights exception" to the Tennessee Governmental Tort Liability Act (GTLA) to dismiss Mosier's negligence claims against Evans in both his official and personal capacities and the vicarious liability claim against Crockett County. The court invoked the GTLA's "discretionary function exception" to dismiss the negligent hiring, training, retention, and supervision claim against Crockett County. The civil-rights exception bars all these claims, save for the personal-capacity claim against Evans.

The GTLA recognizes that Tennessee "governmental entities" are broadly immune from state-law tort liability. *See* Tenn. Code Ann. § 29-20-201(a). This immunity extends to state-law tort claims against officials sued in their official capacities. *Siler v. Scott*, 591 S.W.3d 84, 102 (Tenn. Ct. App. 2019) ("[W]here [the] GTLA immunizes a governmental entity, it follows that an officer is also immune when sued in his official capacity." (second alteration in original) (citation omitted)). The GTLA then selectively waives that broad grant of immunity and creates exceptions to those waivers. As relevant here: "Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of . . . false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or *civil rights*." Tenn. Code Ann. § 29-20-205(2) (emphasis added).

What does it mean to arise out of civil rights?  The Tennessee Supreme Court has not answered the question, so we must predict what the Tennessee Supreme Court would say.  *See Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  We have some relevant data to guide us.

First, the Tennessee Supreme Court has been clear that the GTLA's waivers of immunity are to be "strictly construed" "in favor of the sovereign."  *See Lawson v. Hawkins County*, 661 S.W.3d 54, 60 (Tenn. 2023) (citations omitted).  The GTLA "provides that 'any claim for damages must be brought in strict compliance with the terms of this chapter.'"  *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 361 (Tenn. 2011) (quoting Tenn. Code Ann. § 29-20-201(c)).  The Tennessee Supreme Court has read this language to say that a "strict constru[ction]" approach "has been expressly incorporated into the Act."[2]  *Id.* (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 399 (Tenn. 1995)).

Next, we are guided by decisions of the Tennessee Court of Appeals, which are persuasive evidence of what the Tennessee Supreme Court would do.  *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 823 (6th Cir. 2015).  Those decisions have construed the GTLA's civil rights exception and lead us to conclude that Mosier's claims "arise out of civil rights" under the GTLA.

Start with *Cochran v. Town of Jonesborough*, 586 S.W.3d 909 (Tenn. Ct. App. 2019). There, Cochran sued Officer Peace, who arrested him, and the Town of Jonesborough in federal court, alleging that he had been handcuffed too tightly.  *Id.* at 911–12.  Cochran brought both a Fourth Amendment excessive-force claim against Peace under § 1983, and a state-law negligence claim against the Town.  *Id.* at 912.  The negligence claims alleged that the Town had failed to train and supervise Peace and that the Town was vicariously liable for Peace's negligence in handcuffing Cochran.  *Id.*  The district court granted summary judgment to Peace

---

[2]The dissent says that we should instead apply other interpretive canons, such as those federal courts apply to the Federal Tort Claims Act, to arrive at "a more expansive reading of the civil rights exception." Dis. Op. at 25. But we are bound by the Tennessee Supreme Court's interpretation of Tennessee law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  And just as "[w]e have no authority to construe the language of a state statute more narrowly than the construction given by that State's highest court," *City of Chicago v. Morales*, 527 U.S. 41, 61 (1999), we have no license to construe it more expansively either.

on the excessive-force claim and declined to exercise supplemental jurisdiction over the negligence claims, dismissing them without prejudice. *Id.* Cochran then refiled the negligence claims in state court. *Id.* The state trial court dismissed the claims, reasoning that the GTLA's civil-rights exception applied because the claims arose "from the same set of facts upon which [Cochran] alleged that his constitutional and civil rights had been violated." *Id.* at 913. Cochran appealed.

The Tennessee Court of Appeals affirmed. "As an initial matter," the court rejected the notion that a plaintiff could avoid the civil-rights exception simply by casting his claims as sounding in negligence. *Id.* at 918. The "plaintiff's characterization of the claims in his complaint is not dispositive." *Id.* The court then surveyed its prior cases, and concluded that in all but a single, unpublished, decision—*Parker v. Henderson County,* 2010 WL 377044 (Tenn. Ct. App. Feb. 4, 2010)—the Tennessee Court of Appeals had held that the civil-rights exception applied when civil-rights claims and negligence claims were "based on the same facts." *See id.* at 915–921. Citing the Tennessee Supreme Court's "well-established principle that statutes permitting suits against the State must be strictly construed," the court rejected *Parker*, deciding instead "to follow the greater weight of authority and embrace the application of [the civil-rights exception] that preserves immunity." *Id.* at 920–21 (citations omitted). According to that construction, courts must look to the "gravamen" of the plaintiff's claim—"'the substantial point, the real purpose, or the object' of his action"—to determine whether it arises out of civil rights. *Id.* at 918–19 (quoting *Benz-Elliott v. Barrett Enters., LP*, 456 S.W.3d 140, 148 (Tenn. 2015)).

Applying that standard, the court held that Cochran's claims "sound[ed] squarely in civil rights." *Id.* at 919. The "premise" of Cochran's negligence action was that he had been "injured by the manner in which Officer Peace handcuffed and arrested" him. *Id.* Although Cochran cast those claims as sounding in "negligence," *see id.* at 919 n.3, the essence of the allegations amounted to "excessive handcuffing," which, the court noted, is associated with the civil right to be free from excessive force under the Fourth Amendment, *id.* at 919. Thus, "regardless of how [Cochran] chose to characterize those claims in his state action," the state-law claims were covered by the civil-rights exception because they "stem[med] from" civil rights. *Id.*

Cochran protested that his claims could not have arisen out of civil rights; after all, the federal court had dismissed his § 1983 claim on the ground that Cochran's right to be free from excessive force had *not* been violated. *Id.* at 919, 920 n.4. The court of appeals was unmoved, noting that "[n]othing in the language" of the GTLA requires a finding that a civil-rights violation "occurred," only that the "injury" be one that "arises out of . . . civil rights." *Id.* at 920 (second alteration in original) (citation omitted). Because the alleged "underlying act of purported negligence" giving rise to Cochran's state law claims was "aggressive handcuffing," his claim arose out of civil rights, even though it was filed under the "guise of negligence." *Id.* at 920, 921 (citations omitted).

In *Siler v. Scott*, the Tennessee Court of Appeals again considered the question and reiterated its holding in *Cochran*. *Siler*, 591 S.W.3d at 97. There, Siler brought a federal civil-rights claim for excessive force against several officers, as well as a state-law negligence claim against Campbell County for its failure to supervise and train the officers. *Id.* at 92, 95. The court of appeals held that *Cochran* "compelled" it to conclude that the civil-rights exception applied and barred the negligence claim. *Id.* at 97. That was so because, as in *Cochran,* Siler "alleged violation of his federal civil rights in his federal action" and "[a] claim of excessive force by law enforcement officers often involves the implication of a civil rights action." *Id. Siler* is the most recent published Tennessee Court of Appeals decision to address the question.

*Cochran* and *Siler* hold that an injury arises out of civil rights when a civil-rights violation is the "gravamen" of the complaint. *See Cochran*, 586 S.W.3d at 918. The Tennessee Court of Appeals has explained that the plaintiff's "characterization of the claims" does not control; what matters is the claim's "substantial point" or "real purpose." *Id.* at 918–19 (citation omitted). And there need not have been an actual civil-rights violation. *Id.* at 920. Rather, Tennessee courts ask whether the claim is "based on the same facts" or is sufficiently related to an accepted civil-rights claim. *See id.* at 918–19.

That standard is consistent with the approach we have taken in our prior cases. In *Johnson v. City of Memphis*, Johnson brought a § 1983 claim and moved to amend her complaint to add a negligence claim. 617 F.3d 864, 867 (6th Cir. 2010). The § 1983 claim alleged that officers' entry into a home violated the Fourth Amendment. *See id.* at 868. The negligence

claim alleged that a 911 dispatcher had failed to relay relevant information to those officers.  *See id.* at 871.  This court affirmed the district court's denial of the motion to amend under the civil-rights exception because the "claim regarding the dispatcher's negligence arises out of the same circumstances giving rise to her civil rights claim under § 1983." *Id.* at 872.  We reiterated that standard in *Devereux v. Knox County*, 15 F.4th 388 (6th Cir. 2021), and collected cases demonstrating that we continue to apply *Johnson*'s "aris[ing] out of the same circumstances" analysis, as does the Tennessee Court of Appeals. *Id.* at 393.  We added that, "under *Cochran*," the issue is whether negligence claims "sound in civil rights," and noted that the "presence of a civil rights claim is not strictly necessary" for the GTLA's civil-rights exception to bar a negligence claim. *Id.* at 397.

The dissent would disregard this uniform authority as a predictor of how the Tennessee Supreme Court would rule.  That is because two unpublished opinions of the Tennessee Court of Appeals persuade the dissent that the Tennessee cases point "in conflicting directions."  Dis. Op. at 25 (citing *Parker*, 2010 WL 377044 (Tenn. Ct. App. Feb. 4, 2010), and *Neely v. McDonald*, 2000 WL 1568387 (Tenn. Ct. App. Oct. 20, 2000)).  But those two cases predate the published decision in *Cochran*; and *Cochran* resolved the conflict.  In *Cochran*, the Tennessee Court of Appeals, expressly acknowledged a "conflict in how [it had] applied section 29-20-205(2) in the past."  586 S.W.3d at 916.  The court then analyzed its caselaw in detail, concluding that, although it had "reached a different result in *Parker*," *id.*, the "greater weight of authority" favored the "gravamen," "substantial point," or "real purpose" standard. *Id.* at 915–21.  And "[k]eeping in mind" the Tennessee Supreme Court's admonition "that a strict construction approach to the GTLA 'has been expressly incorporated into the Act,'" the court decided to follow the majority approach "and embrace the application of section 29-20-205(2) that preserves immunity." *Id* at 921 (quoting *Hughes*, 340 S.W.3d at 361).  Then, in *Siler*, the court held that the "lines of authority culminating most recently in *Cochran*" "compelled" it to do the same. *Siler*, 591 S.W.3d at 97.

As for our cases, the dissent finds "conflicting rulings" based on one forty-year-old federal district court case: *McKenna v. City of Memphis*, 544 F. Supp. 415 (W.D. Tenn. 1982), *aff'd*, 785 F.2d 560 (6th Cir. 1986).  Dis. Op. at 25.  But our opinion in *Johnson* adopted the

"aris[ing] out of the same circumstances" standard after considering *McKenna*, based on the "results reached by the majority of district courts addressing this question." *Johnson*, 617 F.3d at 872. And we have consistently applied the *Johnson* standard thereafter. *See, e.g.*, *Est. of Erwin by & through Erwin v. Greene County*, 861 F. App'x 1, 8 (6th Cir. 2021); *Savage v. City of Memphis*, 620 F. App'x 425, 430 (6th Cir. 2015); *see also Devereux*, 15 F.4th at 393.

After *Cochran*, which abrogated cases like *Parker*, the decisions of the Tennessee Court of Appeals are uniform. *See Siler*, 591 S.W.3d at 97. That uniform approach is consistent with this court's interpretation of the civil-rights exception, *see Devereux*, 15 F.4th at 393, and the Tennessee Supreme Court's explicit instruction that waivers of sovereign immunity in the GTLA are to be construed narrowly, *see Lawson*, 661 S.W.3d at 60. That is convincing evidence of what the Tennessee Supreme Court would do, and neither Mosier nor the dissent cite any good law to the contrary.

The standard announced in *Cochran,* and recognized by this court in cases like *Devereux*, bars Mosier's state-law negligence claims against Evans in his official capacity and against Crockett County. Mosier brought a § 1983 excessive-force claim against Evans and a § 1983 municipal-liability claim, premised on that use of force, against the County. The GTLA, of course, does not bar the federal claims. In addition to his federal claims, Mosier pled state-law claims in the alternative. The state law claims alleged that Evans had been merely negligent in his use of force, that the County was vicariously liable for that negligence, and that the County had been negligent in hiring, training, retaining, and supervising him. Specifically, Mosier alleged that Evans had been negligent in using Mosier's "overall strap to restrain and move him as it was likely to separate causing [him] harm." R. 1-2, Complaint, PageID 19. Relatedly, Mosier alleged that Evans was negligent in "grabbing onto the strap of [Mosier's] overalls as it was foreseeable that the strap could break and result in [Mosier] falling to the ground." *Id.* at 13. But a separated or broken overall strap is not harmful on its own. It could have caused Mosier harm only because Evans grabbed onto or pulled on it. Evans' purported act of negligence is, thus, based on the same conduct that Mosier alleged constituted excessive-force. Revealingly, Mosier's complaint alleged that Evans was "negligent in the use of excessive physical force." *Id.* at 19. The gravamen of Mosier's negligence claims, like Cochran's negligent handcuffing

claim, is that Evans applied too much force in controlling Mosier and "should be held responsible." *See Cochran*, 586 S.W.3d at 921. Under Tennessee law, that is sufficiently related to a civil-rights claim to be barred by the civil-rights exception, regardless of Mosier's characterization. Mosier's negligence claims against Crockett County are premised on that same use of force, and on the same employment practices that Mosier challenges in his § 1983 claim. The civil-rights exception therefore bars the official capacity claim against Evans; it also bars the vicarious liability claim and the negligent hiring, training, retention, and supervision claims against the County. *See id.* at 913.

Mosier argues that the civil-rights exception does not apply to these claims because he pled negligence or a civil-rights violation, in the alternative. And the dissent agrees. But *Cochran* forecloses that argument. Cochran, too, pled alternatively in federal court, arguing both that Peace was liable under § 1983 for excessive force and that the Town was vicariously liable under state law for "the negligence of Officer Peace in the effectuation of the arrest." *Id.* at 913. But even after Cochran failed to prove his federal claim, the fact of alternative pleading did not stop the civil-rights exception from applying because the plaintiff's characterization of the claims is "not dispositive." *Id.* at 918.

*Nichols v. Metropolitan Nashville Airport Authority*, 2021 WL 1426992 (Tenn. Ct. App. Apr. 15, 2021), illustrates the point. Nichols brought negligence claims against the Airport Authority for injuries he sustained when officers arrested him using an "arm bar restraint." *Id.* at *1. Notably, Nichols alleged only "that the officers negligently assessed the amount of force necessary rather than alleging that they intentionally used excessive force." *Id.* And he formally pled only negligence claims, never claiming that the officers violated his civil rights. *Id.* The court of appeals still applied the GTLA's civil-rights exception. *Id.* at *4. Looking to Nichols' underlying factual allegations, the court concluded that the "common thread" was that the airport officers "used more force than was necessary under the circumstances," which sounded in civil rights. *Id.* Accordingly, the claims, though described exclusively as negligence, were barred by the civil-rights exception. *Id.* at *5.

The same rule governs Mosier's negligence claims. Mosier's alternative pleading avers that Evans was negligent in using Mosier's overall strap to "restrain and move him" because it

was likely to separate and cause him harm.  R. 1-2, Complaint, PageID 19.  But the separated strap caused Mosier harm only because Evans pulled on it, *i.e.*, applied force to it.  The dissent disagrees and says that the separated strap could have caused Mosier harm even if Evans had not applied force.  Regardless of whether that is hypothetically possible, it is not what Mosier alleges.  Mosier complains that the strap was used to "restrain and move him."  *Id.*  Those actions involve force.  And in the very next sentence, Mosier alleges that Evans was "negligent in the use of excessive physical force."  *Id.*  The "gravamen" of Mosier's claims, therefore, is that Evans used too much force.  *See Cochran*, 586 S.W.3d at 918.  And, under Tennessee law, characterizing that use of force as "negligence" is not enough to escape the civil-rights exception.  *Id.* at 919.  The district court properly dismissed Mosier's negligence claims against Evans in his official capacity and against Crockett County because they are barred by the GTLA's civil-rights exception.

B.

That leaves Mosier's state-law negligence claim against Evans in his personal capacity. Mosier now claims that the district court erred in dismissing that claim, arguing that the GTLA's civil-rights exception does not extend to Evans in his personal capacity.  His argument has merit. The GTLA "immunity afforded governmental entities does not extend to the employee." *Hughes*, 340 S.W.3d at 359 n.3.  "The upshot is that a plaintiff may seek to hold employees personally liable when their governmental employer is immune, at least insofar as the public-duty doctrine or other applicable law would not independently bar the suit."  *Lawson*, 661 S.W.3d at 65.  Mosier's claim against Evans in his personal capacity is not barred by the GTLA.

Evans argues that Mosier forfeited this argument by raising it for the first time on appeal. Whether or not forfeiture occurred below, we would exercise our discretion to excuse it.  *See Moody v. United States*, 958 F.3d 485, 493 (6th Cir. 2020) (recognizing our discretion to excuse forfeitures); *Johnson v. Ford Motor Co.*, 13 F.4th 493, 504 (6th Cir. 2021) (exercising discretion to excuse forfeiture over a "question of law" that "does not require any further factual development").  We leave to the district court's discretion to decide whether to exercise supplemental jurisdiction over this claim, mindful of the fact that this is the only claim remaining in the case.

\* \* \*

We AFFIRM the judgment of the district court except that we REVERSE the dismissal of Mosier's negligence claim against Evans in his personal capacity and REMAND for further proceedings consistent with this opinion.

_____

**CONCURRENCE / DISSENT**
_____

CLAY, Circuit Judge, concurring in part and dissenting in part. This case considers whether a plaintiff who was slammed to the ground after briefly attempting to pull away from a deputy can proceed with his civil rights and state law negligence claims. In all but one respect, the majority says he cannot. Because our case law allows the plaintiff to proceed on his Fourth Amendment claim and negligence claims under state law, I respectfully dissent in part.

On March 2, 2019, Plaintiff Timmy Mosier was arrested for public intoxication and brought to the Crockett County Jail. Once inside the jail and handcuffed, Mosier was moved toward booking by Deputy Joseph Evans, who tugged Mosier along by using his overalls strap as a tether. Over the course of just ten seconds, Mosier briefly attempted to pull away once by turning towards Evans and then pivoting his body. Immediately, and while another jail official was present, Evans violently swung Mosier to the ground, knowing he could not break the fall because his hands were cuffed behind his back. When Mosier's body hit the concrete floor, he bled on impact, temporarily lost the ability to move his legs, and sustained other serious injuries.

Based on this incident, Mosier sued Evans and Crockett County for (1) violations of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and (2) intentional tortious conduct and negligence under Tennessee law. The district court dismissed Mosier's negligence claims under state law on the basis that Defendants enjoyed immunity under the Tennessee Governmental Tort Liability Act (GTLA), Tenn. Code Ann. §§ 29-20-101 *et seq.* The district court also granted summary judgment to Defendants on Mosier's claims under 42 U.S.C. § 1983, concluding that Mosier's Fourth Amendment claim was barred by qualified immunity, Mosier had failed to demonstrate a Fourteenth Amendment violation, and his claims against the County failed because he had not satisfied the requirements for municipal liability under § 1983.

On appeal, a majority of this panel agrees with the district court except as to Mosier's negligence claims against Evans in his personal capacity. The district court and majority's conclusion is flawed in two respects. As to Mosier's Fourth Amendment claim under § 1983,

there is a genuine dispute of material fact regarding whether Evans' use of force violated clearly established law.  In holding otherwise, the majority errs by affirming the district court's grant of summary judgment to Evans on Mosier's Fourth Amendment claim.[1]  Furthermore, the GTLA does not bar Mosier's state law negligence claims against any defendant, making dismissal improper.

I.

Turning first to Mosier's Fourth Amendment claim under § 1983, Mosier alleges that Evans' decision to slam him down onto the concrete floor constituted excessive force.  Although the district court determined that there was a genuine dispute of material fact as to whether the force Evans used was excessive, it concluded that qualified immunity applied because Evans had not violated a clearly established right.  The majority opinion agrees, contending that our case law "did not provide Evans fair warning that his conduct was unconstitutional."  Majority Op. at 5.

However, a review of our case law confirms that, at minimum, there is a genuine dispute of fact as to whether qualified immunity bars Mosier's excessive force claim.  To overcome qualified immunity, a plaintiff must demonstrate that an official violated a clearly established statutory or constitutional right under federal law.  *Reed v. Campbell Cnty.*, 80 F.4th 734, 742 (6th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).  A right is clearly established if its contours are "sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted).  To satisfy this standard, our case law need not present the exact same fact pattern as the challenged conduct, *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)); rather,

---

[1]As to Mosier's Fourteenth Amendment and municipal liability claims, it was proper for the district court to dismiss them.  Mosier substantially relinquished his Fourteenth Amendment claim through his cursory briefing on this issue on appeal and by not disputing Defendants' factual assertions that they made medical care available in a reasonably prompt manner in his opposition to Defendants' motion for summary judgment.  Mosier also does not satisfy the requirements for municipal liability because he has failed to demonstrate that a policy or custom caused his injuries and that Crockett County inadequately trained Evans or ratified his conduct.  *See Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013) (citation omitted).

the question is whether reasonable officials would have had a fair warning "of what the Constitution requires," *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011).

This Court has identified such a right applicable to this case. In our Circuit, "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009). Thus, at the summary judgment stage, qualified immunity is inappropriate if there is a genuine dispute of fact as to whether a handcuffed defendant posed a threat to an officer. *See Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013). For example, in *Burgess*, this Court reversed a grant of summary judgment to defendants because the parties disputed a handcuffed arrestee's level of resistance prior to a takedown. *Id.* The plaintiffs claimed that the arrestee cooperated except for an offensive remark, while the defendants "assert[ed] that [the arrestee] was combative so as to impede the efforts to search him and, specifically, that he pulled away from the deputies and disobeyed multiple orders to keep his head on the mat." *Id.* at 474–75. Viewing these facts in the light most favorable to the plaintiffs, the Court concluded that a reasonable jury could determine that the arrestee did not pose a threat and therefore the officers' takedown violated a clearly established right to be free from excessive force. *Id.*

Similarly, there is a genuine dispute of fact as to whether Evans violated a clearly established right. Viewed in the light most favorable to Mosier, his conduct "d[id] not present a danger to" Evans. *See Harris*, 583 F.3d at 367. Mosier admits that he briefly attempted to pull away from Evans while he was being tugged through the jail by his clothing. However, according to Mosier, this incident lasted approximately ten seconds, Mosier did not repeatedly pull away, he disputes that this was aggressive, and a second jail official was present when the takedown occurred. Mosier's expert, Mr. Looper, who has over fifteen years of experience in law enforcement, lends additional support to this account by stating that "Mosier was securely handcuffed and restrained in an area from which [he] could not escape" and that at this stage, he would have been "adequately searched." Looper Rep., R. 82-8, Page ID #765–66.

Despite this, the majority concludes that Mosier was a danger to Evans, claiming that his pivot away from Evans was "forceful[]" and "more aggressive and threatening" than the conduct

at issue in prior cases, a contention which Mosier denies. *See* Majority Op. at 5. The disagreement about what occurred is not appropriate for resolution at the summary judgment stage, since we must view the facts "in the light most favorable to" the non-moving party. *See Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011). Instead, the majority appears to view the facts in the light most favorable *to Evans*. For example, the majority concludes that Mosier's conduct was forceful, although Mosier denies this allegation. Likewise, while the majority describes Mosier's conduct as aggressive, Mosier disputes that it was aggressive for him to attempt to pull away one time while Evans jerked him along their pathway by his overalls strap. The law does not permit our Court to invert the summary judgment standard in this way.

To defend this view of the facts, the majority points to a video of the incident, which it contends demonstrates that Mosier posed a danger to Evans. While a court may "consider videotape evidence at the summary-judgment stage," a video only resolves a factual dispute if it "blatantly contradict[s]" one party's version of the facts. *See Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (second quotation citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The grainy video in this case, with audio that is impossible to understand, is a far cry from this standard. The relevant portion spans just ten seconds: In that timespan, all that can be observed is that Mosier turned to face Evans, then pulled away once by pivoting, and within three seconds of that, he was being slammed to the floor. If anything, the video confirms that Mosier's hands were firmly restrained behind his back, unable to break free, and that a second jail official was present and available to provide assistance to Evans. These facts support Mosier's claim that he did not pose a danger to Evans.

Stripped of disputed facts, the majority's analysis is left with only Mosier's admission that he briefly attempted to pull away from Evans. *Harris*, a case that also involved an intoxicated and handcuffed arrestee, provides a fair warning that this fact alone does not permit an officer to perform a takedown. There, our Court held that three incidents violated a clearly established right against excessive force. *Harris*, 583 F.3d at 366–67. The first incident was a takedown that occurred when an officer attempted to remove the plaintiff's belt and jewelry during booking, prompting the plaintiff to make a remark and step back. *Id.* at 366. This Court concluded that the plaintiff did not actively resist by stepping back from the officer who was

removing his belongings, inasmuch as the plaintiff "was handcuffed" and "did not pose an immediate threat to the Officers or anyone else" at the jail. *See id.* *Harris* controls in this case and it forecloses the majority's argument because Mosier was handcuffed and inside the jail when he attempted to pull away, just as Harris was when he stepped back from the officer who was actively removing his belongings.

In response to *Harris*, the majority attempts to draw a line between stepping back and briefly attempting to pull away. That strained distinction demands too much. Although qualified immunity presents a high bar, our case law has repeatedly warned that a plaintiff need not show the exact same fact pattern to overcome it. *Chapman*, 814 F.3d at 461 (citation omitted). The majority disregards that admonition. It holds that Mosier cannot overcome qualified immunity, although there exists a case involving an intoxicated arrestee, who like Mosier was in handcuffs and already at the jail, just as Mosier was, because he "pivoted," rather than "stepped back."

In light of our case law, there is a genuine dispute of fact as to whether Mosier posed a threat to Evans by momentarily resisting being pulled along by his clothing, and therefore whether Evans violated clearly established law. Certainly, Mosier is entitled to argue that Evans engaged in excessive force, under these circumstances, by slamming Mosier to the floor. On this basis, I dissent from the majority's conclusion that qualified immunity bars Mosier's Fourth Amendment claim under § 1983.

II.

Turning next to Mosier's claims under state law, I would reverse the district court's dismissal of Mosier's negligence claims. The majority accurately states that the GTLA cannot bar any claims Mosier raises under § 1983 and does not bar Mosier's state law claims against Evans in his personal capacity, inasmuch as the GTLA's immunity extends only to suits against the government and individuals in their official capacity. However, the GTLA also does not bar Mosier's state law negligence claims against Crockett County and Evans in his official capacity because these claims do not fall under the GTLA's civil rights exception. *See* Tenn. Code Ann. § 29-20-205(2).

Under Tennessee law, political subdivisions like Crockett County enjoy governmental immunity. *See id.* § 29-20-201; *see also id.* § 29-20-102. However, the GTLA waives immunity for the negligent acts "of any [government] employee within the scope of his employment." *Id.* § 29-20-205. The GTLA also sets forth a set of exceptions to waiver for which immunity is maintained. *See id.* Among other exceptions, the GTLA maintains a government entity's immunity "if the [plaintiff's] injury arises out of . . . civil rights." *Id.* § 29-20-205(2). The majority concludes that this provision, known as the civil rights exception, bars Mosier's negligence claims in this case.

As the majority points out, because no Tennessee Supreme Court case interprets the scope of the civil rights exception, this Court must anticipate how the Tennessee Supreme Court would rule. *See Bear Stearns Gov't Secs., Inc. v. Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). For this purpose, the decisions of the Tennessee Court of Appeals are "viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.* Applying this standard, the majority concludes that "an injury arises out of civil rights when a civil-rights violation is the 'gravamen' of the complaint." Majority Op. at 13. According to the majority, because the gravamen of Mosier's negligence claims is that Evans violated Mosier's civil rights, his state law negligence claims are barred by the GTLA's civil rights exception.

A number of principles cut against the majority's interpretation. When a plaintiff plausibly alleges a distinct negligence claim under state law, the civil rights exception should not bar it because "the General Assembly has clearly expressed its intent to waive governmental immunity for injuries proximately caused by negligent governmental acts." *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 89 (Tenn. 2001) (Holder, J., concurring). Tennessee's Rules of Civil Procedure lend further support for this position, since they permit "relief in the alternative or of several different types," Tenn. R. Civ. P. 8.01, and suggest that a plaintiff should be able to bring a state law negligence claim in the alternative to a civil rights claim. Finally, the majority's interpretation is inconsistent with the fundamental pleading principle that plaintiffs are "the masters of their complaint[s]," *Mullins v. State*, 294 S.W.3d 529, 540 (Tenn. 2009), and can therefore choose to plead negligence claims.

To defend its contrary interpretation, the majority raises two points. First, to support a narrow reading of the civil rights exception, it refers to the canon that statutes abrogating common law immunity must be strictly construed. However, the majority places more weight on this general maxim than it can bear, as the only principle of statutory construction that supports its reading. Moreover, another canon compels this Court to construe remedial statutes "broadly to extend coverage and their exclusions or exceptions . . . narrowly." *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 985 (6th Cir. 2009) (citations omitted). This remedial principle applies even when a statute, like the GTLA, is in derogation of the common law. *See Grainger & Co. v. Johnson*, 286 F. 833, 835 (6th Cir. 1923). Indeed, this Circuit has already recognized that the remedial-construction canon applies to the GTLA's federal counterpart, the Federal Tort Claims Act. *See Wyatt v. United States*, 783 F.2d 45, 47 (6th Cir. 1986). Thus, at the least, a more expansive reading of the civil rights exception, not a narrow one, is supported by our case law.

The majority also points to a few Tennessee Court of Appeals cases that it believes support its reading of the civil rights exception. *See, e.g.*, *Cochran v. Town of Jonesborough*, 586 S.W.3d 909, 918–19 (Tenn. Ct. App. 2019); *Siler v. Scott*, 591 S.W.3d 84, 98 (Tenn. Ct. App. 2019). However, the cases of the Tennessee Court of Appeals point in conflicting directions. *See, e.g.*, *Parker v. Henderson Cnty.*, No. W2009-00975, 2010 WL 377044, at *4–5 (Tenn. Ct. App. Feb. 4, 2010) (holding that negligence claims arising from the execution of search warrant were not barred by civil rights exception); *Neely v. McDonald*, No. M2000-00099, 2000 WL 1568387, at *5 (Tenn. Ct. App. Oct. 20, 2000) (same for negligence claims based on officers' conduct); *see also Cochran*, 586 S.W.3d at 916 (noting that "there appears to be some conflict in how this Court has applied section 29-20-205(2) in the past"); *Siler*, 591 S.W.3d at 97 (stating that "there is a split of authority" in Tennessee Court of Appeals cases interpreting the civil rights exception). Likewise, although this issue has appeared infrequently before this Circuit, our case law also reflects conflicting rulings. *Compare Johnson v. City of*

*Memphis*, 617 F.3d 864, 872 (6th Cir. 2010), *with McKenna v. City of Memphis*, 544 F. Supp. 415, 419 (W.D. Tenn. 1982), *aff'd*, 785 F.2d 560 (6th Cir. 1986).**²**

The majority makes a great deal of the fact that, of the small number of cases addressing this issue, *Cochran* appears to say that a greater number favor its interpretation. *See Cochran*, 586 S.W.3d at 915. But our job of predicting how the Tennessee Supreme Court would rule is not discharged by simply counting up the cases on one side and the other. Although it may be easier if this were our task, jurisprudence, after all, is not basic math. The Tennessee Court of Appeals has multiple times been able to reach diverging conclusions as to the scope of the civil rights exception. The fact that it has, when making a reasoned decision regarding the other factors discussed above, suggests that the Tennessee Supreme Court might decide this issue differently. *See Dow Corning*, 419 F.3d at 549.

What's more, the majority's math leaves something to be desired. *Cochran* cites only two Tennessee Court of Appeals cases that interpret the civil rights exception in the majority's way. *See Cochran*, 586 S.W.3d at 915–16. It points to *Jackson v. Thomas*, No. M2010-01242, 2011 WL 1049804 (Tenn. Ct. App. March 23, 2011) and "at least one other case" in which the Tennessee Court of Appeals "has come to the same conclusion." *See id.* (citing *Lankford v. City of Hendersonville*, No. M2016-02041, 2018 WL 1559971, at *10 (Tenn. Ct. App. Mar. 29, 2018)). Yet the Tennessee Court of Appeals adopted Mosier's interpretation in two other cases. *See Parker*, 2010 WL 377044, at *4–5; *Neely*, 2000 WL 1568387, at *5. The handful of other cited cases in *Cochran* are federal, largely district court, cases. But, of course, it is state court cases that are "viewed as persuasive" when interpreting state law. *See Dow Corning*, 419 F.3d at 549.

---

**²**Besides *Johnson*, the majority cites to *Devereux v. Knox Cnty.*, 15 F.4th 388 (6th Cir. 2021). However, the question before this Court in *Devereux* was whether the district court properly declined supplemental jurisdiction over state law negligence claims, not whether the civil rights exception barred those claims. *See id.* at 390. In light of that, this Court declined to interpret the scope of the civil rights exception. *See id.* at 397. The remaining two Sixth Circuit cases to which the majority cites, both unpublished, each contain a short paragraph discussing the civil rights exception. *See Est. of Erwin ex rel. Erwin v. Greene Cnty.*, 861 F. App'x 1, 8 (6th Cir. 2021); *Savage v. City of Memphis*, 620 F. App'x 425, 430 (6th Cir. 2015). This is hardly an indicator of overwhelming and "uniform authority" supporting the majority's position. *See* Majority Op. at 14.

A final reason suggests that the Tennessee Supreme Court may be reluctant to agree with the majority: The cases on which the majority's interpretation rests raise constitutional concerns. They point to the fact that plaintiffs brought federal civil rights claims as evidence in favor of barring their state law claims under the civil rights exception. *See, e.g.*, *Cochran*, 586 S.W.3d at 920 (pointing to fact that the plaintiff "originally claimed that his injuries arose from violations of his civil rights" in federal court); *Siler*, 591 S.W.3d at 97 (placing weight on the fact that the plaintiff "alleged violation of his federal civil rights in his federal action"). However, the Supremacy Clause prohibits state laws that "interfere with, or are contrary to the laws of congress." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (citation omitted). If federal civil rights claims may be weaponized to bar plaintiffs' state law negligence claims, plaintiffs may be deterred from bringing § 1983 claims. Such interference with § 1983, reflected in the cases cited by the majority, is contrary to the Supremacy Clause. *Id.*

Lastly, even under the majority's interpretation of the GTLA, Mosier has stated a viable negligence claim. According to the majority, courts have invoked the civil rights exception to bar state law claims where a litigant's "civil-rights claims and negligence claims were 'based on the same facts.'" Majority Op. at 12 (citing *Cochran*, 586 S.W.3d at 915–21). However, Mosier alleges at least one theory of negligence under state law that is based on different facts than his § 1983 claim. He argues that Evans negligently "use[d] Plaintiff's overall strap to restrain and move him" through the jail. Compl., R. 1-2, Page ID #19. This theory of negligence identifies a different cause of his injuries, his overalls strap breaking (because Evans used it to move him through the jail), than his excessive force claim, which looks to Evans' use of force to slam him to the ground.

However, the majority concludes that Mosier cannot proceed even on this theory of negligence because a "broken overall strap is not harmful on its own" unless Evans used force to initiate Mosier's fall. Majority Op. at 15. As a factual matter, this is incorrect: The breaking of Mosier's overalls strap could have caused Mosier's injuries even if Evans had not applied force to slam Mosier to the ground.[3] More importantly, the gravamen of this claim is not whether

---

[3]For example, if Mosier had lost his balance, Evans' decision to hold onto Mosier's overalls strap could have still been negligent and have proximately caused Mosier's injuries. Of course, as to his Fourth Amendment

Evans "applied too much force," *see id.* at 16, but whether it was reasonable for a deputy to move an intoxicated plaintiff through a jail by tugging on a strap of clothing. Through these allegations, Mosier pinpoints a different proximate cause of his injuries and a distinct decision by Evans than reflected by his § 1983 claim.

In a list-ditch response, the majority suggests that the civil rights exception applies to this theory because moving someone along, just like slamming someone to the ground, "involve[s] force." *See id.* at 17. But the civil rights exception does not apply by manner of analogy. Arguably, Evans may have had to exert energy to move Mosier along. But merely being moved along was nothing like the forceful takedown that Mosier claims was excessive under § 1983.[4] And no case law cited by the majority urges otherwise. *See, e.g.*, *Cochran*, 586 S.W.3d at 911–12 (involving a situation, unlike in this case, where both the state law negligence and § 1983 claims alleged that the same handcuffing procedure proximately caused injuries).

In fact, the majority's interpretation reflects an alarming possibility: Courts may use the civil rights exception to swallow broad classes of claims that plaintiffs are entitled to plead simply because they can in some way be characterized as relating to civil rights. Should courts do so, they would be out of step with the purpose of the GTLA, Tennessee's pleading rules, principles for interpreting remedial statutes, and the Supremacy Clause. For these reasons, the district court improperly dismissed Mosier's negligence claims against Crockett County and Evans in his official capacity, and the majority errs by affirming the district court.[5] To the contrary, the GTLA allows Mosier to proceed with his negligence claims against Defendants.[6]

---

claim, Mosier does argue that Evans applied force and that he did so excessively. Tennessee's Rules of Civil Procedure would permit Mosier to plead these theories in the alternative. Tenn. R. Civ. P. 8.01.

[4]To prevent Mosier from proceeding on even this theory, the majority seems to find it important that after Mosier pled this theory of negligence in his complaint, "in the very next sentence, Mosier alleges that Evans was negligent in the use of excessive physical force." Majority Op. at 17 (internal quotation marks and citation omitted). That next sentence of the complaint, which is numbered as a new paragraph, is obviously a distinct theory of negligence, just like Mosier's negligent failure to train and supervise theories in this same section of the complaint (which are also numbered as new paragraphs). It should not bear at all on whether the theory of negligence based on his overalls strap is viable.

[5]Because the civil rights exception does not bar Mosier's negligence claims, I would reach the issue before the district court of whether the discretionary function exception to the GTLA bars any negligence claims in this case. *See* Tenn. Code Ann. § 29-20-205(1). At a minimum, Mosier's negligence claims based on the use of his overalls strap and on the reasonableness of Evans' force easily survive the discretionary function exception. Both of

III.

In light of the above, qualified immunity does not bar Mosier's Fourth Amendment claim against Evans under § 1983 and the GTLA does not bar Mosier's negligence claims under state law. Accordingly, I dissent in part.

---

these actions were ad hoc operational decisions by Evans, rendering the discretionary function exception inapplicable. *See Chase v. City of Memphis*, 971 S.W.2d 380, 383–84 (Tenn. 1998) (noting that the discretionary function exception does not apply to operational acts, which it defines as "ad hoc decisions made by an individual or group . . . that stem from a determination based on preexisting laws, regulations, policies, or standards"). In fact, as to Evans' use of Mosier's overalls strap as a tether, the district court does not even suggest the discretionary function exception applies.

**6**If Mosier were able to proceed with his state law negligence claims against all Defendants, the proper procedure would be for him to bring these claims, including those regarding Evans, against Crockett County. *See Sallee v. Barrett*, 171 S.W.3d 822, 825 (Tenn. 2005) (citing Tenn. Code Ann. § 29-20-310) ("[I]f the immunity of a governmental entity is removed, the employee [becomes] immune from suit.").